# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

UNITED STATES OF AMERICA,          :
                                 :
                                 :   Crim. No. 12-303 (NLH/AMD)
                                 :
     v.                       :
                                 :       **OPINION**
                                 :
ADAM LACERDA, a/k/a "Robert          :
Klein," *et al.*,          :
                                 :
        Defendants.          :

---

**HILLMAN, District Judge**:

    For the reasons orally expressed by the Court on the record on
August 15, 2013, Defendant Adam Lacerda's bail and pretrial release is
revoked.  This Memorandum Opinion and accompanying Order serve to
supplement the Court's oral ruling.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

    The facts of this case are familiar to all parties, and the Court
therefore need not provide a full factual recitation here.  In short,
the Defendants in this criminal proceeding are charged with devising
and executing a scheme to defraud timeshare owners of their money and
property through a business entity known as the Vacation Ownership
Group ("VO Group").  Several Defendants are also charged with
committing unemployment fraud for allegedly failing to report income
that they garnered from the VO Group while simultaneously collecting
unemployment benefits from the New Jersey Department of Labor.  Ten
Defendants were initially indicted in this matter: Adam Lacerda a/k/a

"Robert Klein," Ashley Lacerda, Ian Resnick, Steven Cox a/k/a "Steve Coluzzi," Alfred Giordano a/k/a "Alex Jordan," Francis Santore a/k/a "Frank Martin," Brian Corley a/k/a "John Corley," Joseph DiVenti, Joseph Saxon, and Genevieve Manzoni.  To date, Defendants Cox, Giordano, Santore, Corley, and Saxon have all entered guilty pleas before this Court, testified on behalf of the United States at trial or expressed a willingness to do so, agreed to make restitution to victims, and are awaiting sentencing before this Court.

In addition to these ten Defendants charged by Indictment, eight individuals related to this criminal proceeding were charged by way of Information in separate criminal cases: Aimee Allen (Crim.No.13-170); Catherine Bannigan (Crim.No.13-357); Eric Reiff a/k/a "Skip Ray" (Crim.No.13-310); Eric Reilly (Crim.No.13-067); Jeffrey Sawyer (Crim.No.13-335); Nancy Manno (Crim.No.13-334); Ryan Bird a/k/a "Chris Jackson" or "Matthew Bross" (Crim.No.13-406); and Vincent Giordano a/k/a "Alex Jordan" (Crim.No.13-216).  All eight of these individuals have likewise entered guilty pleas before the Court, testified on behalf of the United States at trial or expressed a willingness to do so, pledged to make restitution, and are also awaiting sentencing.  In totality, the thirteen individuals that have confessed their guilt and entered pleas have all admitted — either during their plea hearings or their trial testimony — to conspiring with one another and the remaining Defendants on trial to commit mail and wire fraud at the VO

Group by deceiving timeshare owners and fraudulently obtaining their money.[1]

Each of the Defendants now awaiting sentencing describes a similar scheme. Using deceptive — and in some aspects plainly and intentionally false — sales scripts, VO Group employees contacted timeshare owners by telephone in a boiler room operation and offered them a range of services for an advanced fee after tricking them into divulging detailed financial information about themselves. In actuality, the services were either non-existent or involved a sophisticated "bait-and-switch" scheme in which the victims' credit ratings were adversely impacted. In order to understand the scope and intent of the witness tampering recently uncovered and described throughout this Opinion, it is important to note that many of the very real victims of this scheme[2] are elderly, in dire financial straits,

---

[1]     In addition to the nine separate criminal cases pending before this Court, the successor to the VO Group — VO Financial — is a defendant in a civil matter brought by Wyndham Vacation Resorts ("Wyndham") that is pending before another United States District Judge within this vicinage of the District of New Jersey. Wyndham alleges that VO Financial defrauded Wyndham and its customers by engaging in the same deceptive sales practices described throughout this Opinion. See Wyndham Vacation Resorts, Inc. v. VO Financial Corp. (Civ.No.13-1235) (assigned to the Honorable Renee M. Bumb).

[2]     The procedural history and current status of these matters call upon the Court to engage in a sensitive balancing act. On the one hand, the Defendants currently on trial are presumed innocent and the trial must be, has been, and will continue to be conducted consistent with that paramount constitutional guarantee. Accordingly, even though they are their advocates in some way, the United States has throughout trial referred to VO Group customers who have asserted claims of fraud through the government as "alleged" victims. Certainly, one may be a victim of a company and one or more of its employees, but not a victim of all the employees or owners. However, because the management structure of the VO Group placed its customers in contact with at least three employees for most transactions (a "first line" caller, a

geographically remote from the Defendants, or were particularly

susceptible to telemarking frauds.[3]  For example, Ricky Baker, a victim

in one of the related matters pending sentencing and who testified in

the ongoing trial, was a recent veteran of Operation Enduring Freedom

facing surgery and severe financial pressures when he was defrauded by

an employee of the VO Group.

    According to the United States and the proofs offered at trial,

the architect of the conspiracy is the creator, owner, and Chief

Executive Officer of the VO Group — Defendant Adam Lacerda.  If taken

---

"closer", and a contract process manager) and since so many VO Group
employees have pled guilty to a fraudulent scheme, the vast majority —
if not all — of the alleged victims in the pending trial are in fact
actual victims of the Defendants who have pled guilty. Indeed, the
Court is aware that Victim/Witness Coordinators from the United States
Attorney's Office are actively assisting those victims in explaining
the victims' roles and rights in the sentencing and restitution
process now pending before this Court.
    The Court also notes that the Defendants currently on trial do
not dispute the fact that employees defrauded VO Group customers.
Rather, they attribute these scams to "rogue independent contractors"
out for their own gain. The Court makes these observations to
highlight the specific, broad, and almost certain negative effect that
the victim/witness tampering engaged in by Adam Lacerda, Ashley
Lacerda, Ian Resnick, and others will have on the matters pending
before this Court, and to point out that nothing about their status as
defendants who are presumed innocent justifies or will be able to
mitigate that harm. Stated succinctly, the Fifth Amendment is not a
license to commit a federal crime of such a serious nature.

[3]    In addition to admitting to defrauding scores of victims, many of
the Defendants awaiting sentencing have likewise admitted that their
defrauded customers were vulnerable victims within the meaning of the
United States Sentencing Guidelines.  See U.S.S.G. § 3A1.1(b).  One
particular victim, Clement Schowalter, stands out. For the last forty-
four years, Schowalter has derived his income from his position as a
microphone technician at his place of worship, and he traveled from
Indiana to New Jersey to testify in the ongoing trial. During his
testimony, he was asked why he wrote the number "25" on his VO Group
contract, and responded that VO Group was the twenty-fifth company
that had offered to assist him with his timeshare debt but that had
merely taken his money instead.

as true, the evidence put forth by the Government in this case shows that Adam Lacerda ran the day-to-day operations of a company that hired dozens of telephone workers to scam hundreds of innocent people — many of them vulnerable — out of over $3 million over the course of approximately three years.  The evidence introduced by the United States likewise reveals that, while at the helm of the company, Adam Lacerda repeatedly used an alias to mask his true identity, directed and condoned the practice of his employees using aliases to mask their identities, impersonated bank officials, utilized a spoofing device on his cellular phone that altered his phone number and the sound of his voice in an effort to disguise his identity and location and cause customers to believe that VO Group worked with banks and lending institutions, and used other sophisticated means to defraud innocent individuals of their money.

The Defendants were arrested and made their initial appearances in April and May of 2012.  Shortly thereafter, the United States Magistrate Judge assigned to this case authorized the pretrial release of several Defendants — including Defendant Adam Lacerda — but imposed certain restrictions on them as conditions of their bail.  One of these bail conditions prohibited the Defendants from contacting any and all potential victims and witnesses in this case.  These conditions were altered and made more clear over time.[4]  More

---

[4]    With the exception of Defendant Manzoni, the initial bail orders entered in April of 2012 did not contain the provision prohibiting contact with victims and witnesses. However, the Magistrate Judge subsequently modified the bail orders of Defendants Adam Lacerda, Ashley Lacerda, Resnick, and DiVenti in June of 2012 to include this bail restriction.

specifically, the bail orders precisely indicated that Defendants were "to avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, with the exception of any co-defendants[.]"

On April 23, 2012, Defendant Resnick was appointed counsel under the Criminal Justice Act ("CJA") because he indicated that he lacked the funds to pay for his own representation. Resnick's counsel continued to be funded by the CJA for approximately fourteen months. In May of 2013, however, it came to light that Resnick had falsely represented his financial status to the Magistrate Judge who had appointed him CJA counsel and later to this Court when counsel was appointed for trial. Far from being unable to pay for his own counsel, it was revealed that Adam Lacerda had paid Resnick approximately $119,774 in the second and third quarters of 2012 and approximately $66,557 in the first quarter of 2013 for his work at the VO Group and its successor corporation, VO Financial.[5] Given that Adam Lacerda and Resnick were both charged with conspiring with one other and others to execute a mail and wire fraud scheme, the two had appeared in Court together and likely interacted numerous times during the fourteen-month course of Resnick's CJA-appointed representation. At no point during this time period did Adam Lacerda cease to pay

---

[5]    Resnick swore twice under penalty of perjury that his monthly income did not exceed $7,500, when in fact, evidence at trial showed that his income was in excess of $20,000 per month for the twelve month period prior to the re-appointment of CJA counsel. Upon receipt of this information on May 31, 2013, the Court ordered Resnick to repay the CJA Fund for the funds that had been expended for his representation. The Court notes that Resnick was paid these funds by the Lacerdas' closely held company in the months preceding and during the victim/witness tampering scheme set forth in this Opinion.

Resnick a significant salary or attempt to disclose this information to the Court. Rather, he willfully turned a blind eye to Resnick's fraud on this Court and assisted in the perpetuation of it.

A pretrial hearing was held on June 13, 2013, at which time the United States advised the Court that several victims and potential witnesses had informed the Federal Bureau of Investigation ("FBI") case agent that representatives of VO Financial had recently contacted them. Defense counsel indicated that they were unaware of these calls, but stated that VO Financial utilized an "auto dialing" system and suggested that perhaps these individuals were contacted accidentally as a result. Defendant Adam Lacerda, who oversaw all operations at VO Financial and was presumably the source of the explanation of the improper contacts,[6] was present in court that day and listened to the exchange between counsel and the Court in which the contacts were described as a "wrinkle" that, if misinterpreted, could hurt the supposed legitimate business operations of VO Financial.

Without suggesting any knowing or intentional improper conduct on the part of Defense Counsel, it has since become clear that the contacts made with these victims and witnesses prior to the June 13, 2013 hearing were not unintentional, but rather were the result of an organized, concentrated, and deliberate effort by Defendants Adam Lacerda, Ashley Lacerda, and Ian Resnick to use VO Financial's

---

[6]     Defendant Resnick admitted under cross examination at trial that Adam Lacerda ran the operations of VO Financial and oversaw its "refund" program.

resources, industry and consumer leads, and employees to identify as
many of VO Group's victims as possible, glean personal information
from them about their claims and potential testimony, assert the
Defendants' defenses, influence the witnesses' view of the facts,
mislead witnesses about the status of matters pending in this Court
and the role of the FBI.  Moreover, it is clear that the overall
purpose was an attempt to prevent as many victims as possible from
cooperating with the government agencies investigating and prosecuting
these matters by offering them "refunds," "free" services, and other
financial incentives.

More specifically, the United States issued a trial subpoena to
VO Financial on July 19, 2013, seeking telephone call recordings and
documents related to such recordings with respect to individuals the
Government had identified as potential victim/witnesses in this case.
Amongst the documents produced in response to the subpoena were notes
entered by VO employees into the company's customer service recording
system, "Pipeline."[7]  The United States moved for admission of the
Pipeline documents pursuant to Rules 403 and 404(b) of the Federal
Rules of Evidence on the grounds that the recordings and notes evinced
consciousness of guilt on the parts of Adam Lacerda, Ashley Lacerda,

---

[7]    The United States has proffered to the Court in its written
submission of August 12, 2013, and Defense Counsel has orally
confirmed on the record, that all counsel have stipulated that the
documents are authentic and records kept in the ordinary course of VO
Financial's business, but all parties have reserved the right to
object to admission of the documents on relevance grounds.

and Ian Resnick, and the Court granted the motion and admitted the documents and recordings into evidence on this basis.[8]

The Pipeline records revealed that victim/witnesses Karen Wolff, Mary Hamelin, Ella Culver, David and Marie Jasper, and Ricky Baker (the Afghan war veteran mentioned earlier in this Opinion) were contacted — either directly or indirectly — by Defendants Adam Lacerda, Ashley Lacerda, and Ian Resnick after these Defendants were formally charged and the bail condition restricting their contact with victims and witnesses was in place. These prohibited contacts were also made after Defendants had access to discovery at the FBI's offices for inspection and review purposes, including FBI-302 statements of alleged victims of the Defendants' allegedly fraudulent scheme.

In some instances, the Pipeline notes specifically refer to the dates potential victims and witnesses were interviewed by the FBI. The Pipeline notes also indicate that VO employees contacted potential victims and witnesses to advise them that they could obtain full refunds for the monies they previously paid to the VO Group if they executed a release agreement precluding them from subsequently pursuing litigation against the company.[9] The evidence likewise

---

[8] The Court orally ruled on the admission of this evidence on the morning of trial on August 12, 2013, and supplemented its oral ruling by way of written Opinion and Order on August 16, 2013. [See Docket Nos. 299 & 300.]

[9] Although the release does not on its face preclude a releasor from testifying in this matter, it appears likely that many victims who received a refund and signed such a release would consider any subsequent testimony in this trial unwarranted, unnecessary, or simply an intrusion. The Government has represented to the Court that at least one victim felt that way, and it is simply impossible to know

includes recordings in which Defendant Resnick directly contacted victim/witness Wolff — who despite Resnick's corrupt efforts testified in this case — and attempted to persuade her to sign such a release. On these recordings, Resnick made several material misrepresentations to Wolff about the status of VO Group and the ongoing criminal investigation and prosecution of employees of the company. For instance, when Wolff asked Resnick if he was contacting her to offer her a refund in response to the FBI investigation, Resnick replied falsely that he was not calling for that reason, but rather because Wolff failed to receive a refund two years earlier since her file had inexplicably been lost at the company. Resnick also told Wolff that the investigation into the company was complete, and that VO Group was legally absolved of all wrongdoing. During this same phone call, Resnick also stated that he had spoken to both Adam and Ashley Lacerda about Wolff's file at the company, and implied that he was acting at their direction or, at a minimum, that they were aware that he was attempting to obtain a release from Wolff.[10]

how many more have been similarly affected. This presents a potential perversion of both this case and the related criminal matters pending before this Court, not to mention the civil matter pending before Judge Bumb. Moreover, the general principle of mail and wire fraud is that the crime is committed when the communication is complete, even if the scheme to defraud is ultimately unsuccessful. Except as it may possibly relate to intent, the fact that a victim received a refund is not relevant to the bulk of the charges in this case. See United States v. Okun, Crim.No.3:08-132, 2009 WL 414009, at *2-5 (E.D. Va. Feb. 18, 2009). Furthermore, the Court notes that victims may be entitled to greater compensation beyond a mere refund in the matters awaiting sentencing. In short, victims who have received some compensation remain highly relevant to this case and the related criminal matters.

[10]   Curiously, a strange noise reminiscent of a duck quacking occurs on the recording at the exact moment when Resnick appears to utter

In a subsequent phone call in which Resnick once again attempted to obtain a release from Wolff, he implied that he had not been charged in the matter,[11] falsely told her that the prosecution only related to mortgages and not cancellations, stated that the FBI case agent was a "bully" and "puppet" of VO Financial's competitors, and indicated that the entire investigation was done for "political" reasons since VO's competitors maintained close ties with the FBI. Resnick also preyed on Wolff's emotions by telling her that his life was on the line and that he had a young son.

In yet a third phone call to Wolff, Resnick can be overheard chatting with another VO employee while the line rings. During this exchange, Resnick and the employee joke about convincing Wolff to stop working with the FBI, and the employee states that she wishes they could use a "caller I.D. faker" to make it look as though they were contacting Wolff from the FBI case agent's phone number — a phone application several co-conspirators have testified Adam Lacerda used in furtherance of the conspiracy to contact customers and make it appear as if he was calling from a bank or lending institution that supposedly worked in conjunction with the VO Group. Furthermore, the

Adam and Ashley's names. As proffered by the United States, this strange noise is not evident in any other portion of any of the recordings turned over to the Government in response to the trial subpoena. Moreover, as discussed at other points in this Opinion and as admitted by Adam Lacerda himself during his testimony at trial, the evidence in this case indicates that he was very savvy with computers and technologically proficient. Thus, it remains unknown whether this strange noise on the recording is mere coincidence or an attempt to erase Adam and Ashley Lacerda's fingerprints from this criminal conduct. In any event, one can still audibly discern the names of Adam and Ashley Lacerda upon a careful scrutiny of the recording.

[11]    In fact, Resnick had been charged by criminal complaint and was awaiting a promised Indictment.

Pipeline documents also indicate that in-house counsel at VO Financial was directed by Ashley Lacerda to write a letter to Wolff — who VO believed had declined the deal on advice of her own attorney — to advise her to reconsider her denial on the basis her attorney had given her poor legal advice.[12]

Upon receipt of this information, the Court revoked Defendant Ashley Lacerda's bail on the basis that probable cause existed to believe that she attempted to tamper with a witness in violation of 18 U.S.C. § 1512 and that the record contained clear and convincing evidence that she violated the conditions of her bail order.[13] The Court did not revoke Ian Resnick's bail because he had already been detained on another violation of his bail. Nor did it immediately revoke Adam Lacerda's bail because of insufficient proof of his

---

[12] The letter sent by in-house counsel for VO Financial blatantly violates New Jersey Rule of Professional Conduct 4.2, which states, in relevant part, as follows: "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows, or by the exercise of reasonable diligence should know, to be represented by another lawyer in the matter[.]" N.J. R.P.C. 4.2. The letter plainly indicates that the sender knew Wolff is represented by counsel and implores her in a disturbingly unprofessional way to ignore her lawyer's advice.

[13] Despite probable cause supporting a charge of witness tampering and her clear violation of an important court order and bail condition, the Court has since released Ashley Lacerda to very strict home incarceration for medical reasons. The Court has also made clear on the record that many of the factors that support a finding that Adam Lacerda is a flight risk do not apply to Ashley Lacerda. Such factors include Adam Lacerda's deceptive use of technology, use of aliases, lack of contacts with this District, and ready access to large amounts of cash. It also appears that Defendant Resnick's proposed plan to disrupt and frustrate these proceedings focused on Adam Lacerda fleeing the jurisdiction in order to create a mistrial.

personal involvement in the witness tampering scheme. However, all of that changed on August 15, 2013.

On the morning of trial this past Thursday, August 15, 2013, while being transported by United States Marshals in a secure vehicle from the Federal Detention Center in Philadelphia, Pennsylvania to the Federal Courthouse in Camden, New Jersey, Defendant Resnick attempted to communicate clandestinely with Defendant Ashley Lacerda by tossing a crumpled piece of paper to her while in transit. The U.S. Marshals intercepted the communication, and the note was confiscated and provided to the Court. The note read in its entirety as follows:

> Don't Risk another day in jail – Go to Bermuda – small private plane – from there Cuba or Venisuela [*sic*] – Ask for Asylum – cause mistrial – case falls apart without him here – saves us all – Kryptall.com – no phones – cash only – get [*illegible*] Throw away phone – Destroy + Flush this. If u have GPS and cant [*sic*] go – he must – 2-3 months + case dismissed then go with.

Although Resnick attempted to physically convey this information to Ashley, a review of the note's contents indicates that both Adam and Ashley Lacerda were its intended recipients. This is particularly evident when considering that Resnick knew that Ashley had been seated next to her husband during the previous three weeks of trial and had the opportunity to easily communicate with him, and that prior testimony at trial had indicated that Adam Lacerda — who was not in custody — could easily obtain large amounts of cash and had experience in using an alias and masking his identity.

In light of this new development, the United States promptly moved for the immediate detention of Adam Lacerda and continued detention of Ashley Lacerda. Due to the heightened threat to

courtroom security and significantly increased risk of Defendant Adam

Lacerda's flight (even as soon as the lunch break during trial), the

Court ordered him temporarily detained in advance of a formal bail

hearing pursuant to its authority under 18 U.S.C. §§ 3142 and 3148.

So as not to further delay trial and provide defense counsel an

opportunity to digest this new information and formulate a

contemplated response, the Court ordered a formal bail review hearing

for Adam Lacerda to be set down for that afternoon at 4:30 p.m.

During the temporary detention which occurred on Adam Lacerda's

second day of testimony in his own defense, his attorney had full

access to him in the courtroom holding cell and the courthouse offices

of the U.S. Marshals Service.  In fact, the U.S. Marshals Service,

which had intercepted the note and continued to express legitimate

security concerns, was directed by the Court to permit counsel to meet

and speak with Adam Lacerda without restriction during breaks and

lunch.  The Court likewise indicated, with a modification entered by

subsequent formal written Order entered on the docket, that Adam

Lacerda was permitted to consult with his attorney during the ensuing

long weekend recess from trial about any and all matters, including

his ongoing cross-examination by the Government.  [See Docket No.

294.]

During Adam Lacerda's temporary detention based on the apparent

escape plan, the United States proffered additional and newly

discovered evidence that he was a knowing participant in the elaborate

plan to compromise victim/witness Karen Wolff and other witnesses like

her, and to frustrate the investigative efforts of the FBI and this

Court in the matters awaiting sentencing. Specifically, it was revealed that, far from constituting some inadvertent and unintentional contact with random and isolated victims as a result of automated dialing, Adam Lacerda had worked hand in glove with Ashley Lacerda, Ian Resnick, and others as recently as April of 2013[14] to further prevent potential victims and witnesses from testifying or otherwise participating in this case.[15] More specifically, these parties had worked in concert to create a directed script to provide to managers and sales representatives for the purpose of advising them how to handle a client's potential inquiry about the investigation and prosecution of the VO Group.

The script — which had the legal blessing of in-house counsel — contains numerous false statements intended to deceive and mislead potential clients. For example, the script advises employees to say that the VO Group changed to VO Financial in 2012 for favorable tax purposes, when there is no such evidence present in the case to corroborate such a statement. The script also advises sales representatives to tell clients that the litigation and criminal prosecution pending against the company are baseless, and that VO Financial competitors are "working hand in hand with the FBI" since

---

[14] The Court notes here that this matter was originally scheduled to go to trial this past spring, and was only moved to the summer to accommodate Defense Counsel's requests. The witness tampering in this case, therefore, occurred as the matter was on the verge of trial.

[15] To be clear, the Court has repeatedly stated and counsel for Adam Lacerda has confirmed his understanding that nothing in this Court's orders and directions with regard to contacts with potential victims or witnesses was intended to interfere with counsel's right — and indeed obligation — to initiate such contacts in order to adequately prepare this matter for trial.

they are threatened by and want to stymie its success.  The script also encourages sales representatives to attempt to issue refunds to these individuals, presumably in exchange for an executed release. Not only are the statements contained in this script blatantly false, but they also further highlight the fact that Adam Lacerda, Ashley Lacerda, and Ian Resnick made a concentrated effort to contact potential victims and witnesses in this matter well after the conditions of their bail orders were in place that prevented them from doing so and after they were warned that such conduct was not only prejudicial to the administration of justice, but also a violation of their bail orders.

After affording both Defense Counsel and the United States the opportunity to be heard at the 4:30 p.m. bail review hearing, the Court revoked Defendant Adam Lacerda's bail pursuant to its authority under 18 U.S.C. § 3148.

## II.  DISCUSSION

The Eighth Amendment to the United States Constitution declares that "[e]xcessive bail shall not be required[.]"  U.S. CONST. AMEND. VIII.  Although "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," the Supreme Court of the United States has recognized that "[t]he only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil."  United States v. Salerno, 481 U.S. 739, 754 (1987).

In federal criminal proceedings, the Bail Reform Act of 1984 governs release and detention determinations, and grants "judicial officers" the authority to make determinations regarding bail in all stages of a criminal case, up to and including the trial stage.  See 18 U.S.C. §§ 3141-3156 (1990).  Section 3142 of the Act details the elements and procedure that a judicial officer must consider prior to determining whether an arrestee should be released or detained.  See Salerno, 481 U.S. at 742.  More specifically, the Act provides judicial officers with four options regarding an arrestee awaiting trial: (1) release on personal recognizance or upon execution of an unsecured appearance bond; (2) release on a condition or combination of conditions set by the court; (3) temporary detention; or (4) detention.  18 U.S.C. § 3142(a).

However, even if an individual is released prior to trial under this provision of Act, a judicial officer may revoke such a release if the individual violated a set condition of his release or committed a crime while on release pending trial.  See 18 U.S.C. § 3148(a)("A person who has been released under section 3142 of this title, and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court.").  More specifically, § 3148 of the Bail Reform Act provides that:

> The judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer —
>
> (1) finds that there is —
>> (A)  probable  cause  to  believe  that  the  person  has committed  a  Federal,  State,  or  local  crime  while  on release; or

(B) clear and convincing evidence that the person has
violated any other condition of release; and

(2) finds that —
(A) based on the factors set forth in section 3142(g)
. . . there is no condition or combination of
conditions of release that will assure that the person
will not flee or pose a danger to the safety of any
other person or the community; or
(B) the person is unlikely to abide by any condition
or combination of conditions of release.

18 U.S.C. § 3148(b).  Section 3148(b) further provides that a

rebuttable presumption arises that no condition or combination of

conditions will assure the judicial officer that the individual will

not pose a risk of flight or danger to the community in the case of

individuals that committed a felony while on release.  Id.

Moreover, "the judicial officer is not given unbridled discretion

in making the detention determination," see Salerno, 481 U.S. at 742,

but rather must consider the following factors prior to revoking an

individual's bail and ordering detention: the nature and circumstances

of the offense charged; the weight of the evidence against the person;

the history and characteristics of the person, including his

character, physical and mental condition, family ties, employment,

financial resources, length of residence in the community, community

ties, past conduct, history relating to drug or alcohol abuse,

criminal history, and record concerning appearance at court

proceedings; whether, at the time of the current offense, the person

was on probation or parole while awaiting trial, sentencing, appeal,

or completion of sentence for another offense; the nature and

seriousness of the danger that the individual poses to the community;

and whether the individual's financial means increases his risk of flight. 18 U.S.C. § 3142(g).

In the instant case, the United States moved for the detention of Adam Lacerda under both subsections (A) and (B) of § 3148(b)(1). As discussed above, subsection (A) indicates that the judicial officer may revoke an individual's bail if probable cause exists to believe that the person committed a crime while out on release.[16] Indeed, § 3148 likewise indicates that, if a finding of probable cause is made on these grounds, then a presumption arises that the person should be detained because he poses a risk of flight or danger to the community. Here, there is more than sufficient probable cause to find that Adam Lacerda, Ashley Lacerda, Ian Resnick, and others conspired with one another to tamper with potential victims and witnesses in this case in violation of 18 U.S.C. § 1512(b).[17] As discussed at length above,

---

[16]    The Third Circuit has recently indicated that probable cause exists when there is "'reasonable ground for belief of guilt.'" United States v. Shabazz, App.No.12-3517, 2013 WL 4017277, at *3 (3d Cir. Aug. 8, 2013)(quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)).

[17]    Section 1512(b) states in its entirety as follows:

> Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
> (1) influence, delay, or prevent the testimony of any person in an official proceeding;
> (2) cause or induce any person to—
>      (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
>      (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

these Defendants repeatedly engaged in a pattern of what the court will call a form of "robo-witness tampering" by using their company's resources and technology to connect with potential victims in order to color their view of the case and discourage their involvement by, among other things, offering them a refund in exchange for the execution of a release relieving VO of future liability and litigation. The Pipeline notes and recordings produced in response to the Government's trial subpoena indicate that this witness tampering was a concerted effort by Defendants Adam and Ashley Lacerda and Ian Resnick to frustrate the prosecution of this matter and attempt to lessen the degree and impact of any finding of culpability.

As discussed above, individuals which had been identified by the Government as potential victims and witnesses — information available to Defendants at the FBI's field office for discovery and inspection purposes — were recently contacted and intentionally mislead about the status and underlying basis of the investigation and prosecution of this matter, why VO Group changed its name shortly after the Defendants in this case were arrested, why individuals were not

---

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
(D) be absent from an official proceeding to which such person has been summoned by legal process; or
(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;
[S]hall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(b).

offered refunds sooner or relieved of their timeshare mortgage
obligations initially, and the reason the FBI and the Government were
pursuing the investigation and prosecution of the VO Group in the
first instance.

As evidenced by citations in the Pipeline system, Defendant
Resnick's acknowledgment in a telephone recording, and letters and e-
mails written and sanctioned by in-house counsel at VO Financial, Adam
Lacerda was involved in and condoned this repeated pattern of robo-
witness tampering that appears to have been designed to prevent as
many individuals as possible from participating in and assisting the
Government in the prosecution of this matter.[18]

Moreover, in addition to this evidence of witness tampering
recently brought to the Court's attention in open court, the Court
likewise notes that it has received independent letter communications
from individuals pleading for the Court's help in recovering the funds
of which they were defrauded by VO Group.  The Court also points out
that several witnesses that recently testified during the Government's
case-in-chief indicated in their testimony that they also were
contacted relatively recently by VO and offered the refund and release
deal.  Therefore, in taking all of this evidence into account, the
Court believes there is sufficient probable cause to find that Adam
Lacerda conspired with his co-Defendants and others to tamper with
potential witnesses in this matter in violation of § 1512(b).

_____

[18]     Even as this Opinion is being written, Adam Lacerda has admitted
under cross-examination to having contact with other victims, this
time individuals specifically named in the Indictment as victims.

Given that there is probable cause to believe that Adam Lacerda committed a federal crime while on release, the rebuttable presumption arises that nothing can be done to ensure that he will not flee or pose a risk of danger to the community at large. In his defense, Defendant has argued that there is not a sufficient evidentiary link to tie him to this robo-witness tampering, nor can it be easily discerned who the victims of such a conspiracy were. In the Court's view, the latter argument is utterly unconvincing as it is premised on the absurd contention that Adam Lacerda would not reasonably know that someone who said that VO Group "scammed me" and took "my money" would not consider themselves to be a victim or witness. The argument seems to be that only if someone used the magic word "victim" would it be fair to consider them as such. The law is not so blind. Even if the Court were to put aside Ian Resnick's reference to Adam Lacerda in his calls to Karen Wolff, Adam Lacerda's oversight of the "refund" program, Adam Lacerda's overarching role as CEO of the LLC of which he is the sole member, and Adam Lacerda's financial interest in compromising the claims of victims of the VO Group, the first point is answered by simple reference to Government Exhibit 2006 (B) (in evidence) that shows Adam Lacerda's personal participation in the witness tampering scheme. As such, Defendant's argument on this point is unconvincing and, at a minimum, wholly insufficient to rebut the presumption in favor of detention.

Even if a finding of sufficient probable cause with respect to § 1512(b) did not exist in this case, the Court would nevertheless find the requirements of § 3148(b)(1) fulfilled because clear and

convincing evidence exists to find that Defendant Adam Lacerda

violated a condition of his pretrial release when he attempted to

contact potential victims and witnesses in violation of his existing

bail order.[19]  As discussed above, the Pipeline notes, telephone

recordings, e-mails, and communications initiated by VO Financial in-

house counsel at the direction of the Lacerdas all occurred after the

Magistrate Judge entered Adam Lacerda's bail order in June of 2012

precluding him from having any contact with victims and witnesses in

this case.  As such, for largely the same reasons that the Court finds

that probable cause exists under these circumstances to believe that

Adam Lacerda violated § 1512(b) by attempting to tamper with

witnesses, the Court also finds that clear and convincing evidence

exists that he violated a condition of his bail order while on

pretrial release.  Indeed, several of our sister district courts have

similarly found that a defendant's subsequent contact of a victim or

witness is clear and convincing evidence of an individual's violation

of a pretrial release condition.  See United States v. Jones,

Crim.No.6:09-16-DCR, 2009 WL 1360672, at *5 (E.D. Ky. May 12, 2009);

United States v. Castro-Font, 778 F.Supp.2d 201, 206 (D.P.R. 2011);

United States v. Damante, Crim.No.11-00064, 2012 WL 5288001, at *3 (D.

Nev. Oct. 24, 2012).  Accordingly, it is evident to the Court that,

under the instant circumstances, both subsections (A) and (B) of §

3148(b)(1) are satisfied.

---

[19]    The Third Circuit has recently defined the clear and convincing
evidence standard as "evidence so clear, direct, weighty, and
convincing as to enable a clear conviction[.]"  Kendall v. Daily News
Pub. Co., 716 F.3d 82, 92 (3d Cir. 2013)(internal citations omitted).

Having found the first prong of § 3148(b) satisfied, the Court must next consider whether, based on the factors set forth in § 3142(g), "there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community[.]"  18 U.S.C. § 3148(b)(2).

The risk of flight is substantially great here.  Given that the United States has suggested that it may at some point initiate obstruction of justice charges against him, Adam Lacerda's motive and incentive to flee are even greater now than they were at the time of his initial bail hearing before the Magistrate Judge.  Moreover, the record in this matter indicates that he has both the financial means and experience in international travel by private plane to successfully flee the country.  More specifically, he earns a $400,000 annual salary and the FBI found over $190,000 in cash in a safe in his basement to which only he had the combination on the day the FBI executed a search warrant at his home.  The United States likewise introduced evidence that Adam Lacerda traveled to Mexico by private charter flight as recently as 2011.

Moreover, the record further indicates that Adam Lacerda is technologically sophisticated, had prior work experience in retail electronics, and had previously utilized a spoofing device on his cellular phone to mask his identity, location, and the sound of his voice.  Evidence introduced thus far at trial further revealed that he has also previously masked his true identity through use of an alias, that he had prior experience in impersonating individuals at an

earlier job, and approved of or directed many of his employees to do the same. Indeed, Adam Lacerda testified that the use of fake identities was a common practice both at VO Group and within the timeshare industry in general. In considering this evidence in conjunction with his available financial means and international travel experience, one can readily ascertain that Adam Lacerda has the motive and ability to falsify travel documents[20] and successfully flee the country by utilizing a false identity.[21]

Another factor evincing a serious risk of flight is the fact that Defendant Resnick's note — which directly contemplates Adam Lacerda as one its intended recipients — detailed a specific plan, means of encrypted communication, and method of fleeing the country. The note also directly referred to the Court's plan to release Ashley Lacerda on a GPS monitoring device on the same day that its delivery to her and her husband was attempted. Although the note never reached Adam Lacerda and would have to have gone through Ashley Lacerda first to do so, the fact that it was communicated on that day and was specific

---

[20]    In his testimony this past week, Adam Lacerda, who admits to expertise in computing, corrected the Assistant U.S. Attorney who sought to attribute a document to him and testified about the manner in which signatures can be electronically affixed to a document to create a false impression.

[21]    If convicted of the charges in this case, Adam Lacerda faces a significant term of incarceration. Even if the term is limited to the advisory sentencing guidelines, the recommended term remains significant. Accounting for a base offense level of 7 and adjustments for the amount of loss, number of victims, type of victims, sophisticated means, and obstructive conduct, Adam Lacerda faces an adjusted offense level of 38 and an advisory guidelines range of 235-293 months. Although Adam Lacerda has appeared at all proceedings in this matter, as a verdict looms and a potential sentence of that length hovers, this may serve as a powerful incentive to flee.

suggests that its sender subjectively believed that the recipient would seriously consider its contents. Indeed, the detailed content of the note itself suggests that it most likely was not the only such communication between the Defendants. Thus, when taking all of these considerations into account, the Court finds that Defendant Adam Lacerda poses a serious risk of flight under these circumstances.

Furthermore, prior to revoking an individual's bail, the Court must consider the factors set forth in § 3142(g) of the Bail Reform Act. In this case, almost each and every factor counsels in favor of detaining Adam Lacerda, and not a single one weighs in favor of his continued release. First, the nature and circumstances of the offense charged are serious and the weight of evidence indicating that he committed both the crime of witness tampering and the underlying charges now being tried are substantial. The offense of tampering with a witness in violation of 18 U.S.C. § 1512 carries a maximum twenty-year term of imprisonment and significant fine penalty. See 18 U.S.C. § 1512(b) ("Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person . . . shall be fined under this title or imprisoned not more than 20 years, or both."). As expressed in detail above, the evidence of record that Adam Lacerda engaged in a repeated pattern of robo-witness tampering is clear to the Court. Although the Court need look no further than the compelling testimony of Karen Wolff and the tape recordings of Ian Resnick to find that the weight of the evidence against Adam Lacerda is great, it likewise has a series of Pipeline notes, other telephone

recordings, e-mail communications, and letters before it to support a finding of witness tampering. Thus, these factors of § 3142(g) weigh heavily in favor of detention.

Second, the Court also finds that Adam Lacerda's history and characteristics favor detention under these circumstances. He has no significant ties to this District. Although his wife and her child reside in this District (as he has for several years), his own children and other immediate family do not reside here. Moreover, he maintains substantial contacts in Massachusetts, South Carolina, and Tennessee, where he owns real estate and has access to personal and corporate resources and contacts in the travel industry that could assist his potential flight. Moreover, his contacts in this District arise from his work in the timeshare industry. He first came to New Jersey to work for Wyndham, where by his own admission, he acted as the consummate "scumbag" scamming and defrauding customers on a routine and daily basis. He then moved to create the VO Group, where he was the primary financial beneficiary of a company that has now seen thirteen of its employees, many of them upper management, plead guilty to conspiracy and numerous other felonies in which dozens — if not hundreds — of individuals lost upwards of $3 million. It would not be a stretch to find that Adam Lacerda started to commit criminal, or at a minimum fraudulent, acts the moment he arrived in New Jersey and never stopped.

He also has a prior criminal history, as he was relatively recently arrested on February 6, 2012 for theft by deception in Atlantic County. His admission to a pre-trial diversion program

suggests he admitted to the facts of the underlying charge, a common prerequisite for admission to such programs.[22]

Moreover, as discussed above with respect to his risk of flight, Adam Lacerda has significant financial resources readily available to him, and he continues to serve as the head of VO Financial. Therefore, as contemplated by Defendant Resnick in his thwarted attempt to communicate with the Lacerdas, the present trial could not continue without the presence of Adam Lacerda. Furthermore, § 3142(g) likewise requires the Court to consider "whether, at the time of the current offense [], the person was on . . . release pending trial[.]" 18 U.S.C. § 3142(g)(3)(B). As discussed at length throughout this Opinion, Adam Lacerda's pattern of robo-witness tampering occurred while he was on release awaiting his trial for conspiracy to commit mail and wire fraud, and in direct violation of the conditions of the Court's bail order. As such, these factors also weigh in favor of detaining him.

Under § 3142(g), the Court likewise must consider the nature and circumstances of the individual's potential danger to the community. Unlike most cases of detention, the danger here is not physical danger or violence, but rather is the danger that Adam Lacerda will continue

---

[22] The Court likewise notes that, during his testimony last week, Adam Lacerda admitted that he made false statements in a declaration filed in a civil suit against VO Group by Wyndham that is pending in New Jersey state court. His apparent willingness to lie in a state judicial proceeding indicates a disturbing lack of respect for judicial authority and is another factor favoring detention. Specifically, in the declaration, Adam stated that his wife — and she alone — created VO Group, when in actuality the company was a sole member LLC created by Adam Lacerda. His acts of witness tampering may also frustrate and complicate the civil matter before Judge Bumb, a separate judicial proceeding within the definition of 18 U.S.C. §1512.

to commit crimes upon vulnerable victims while on release. There is substantial evidence that Adam Lacerda served as the primary architect and executioner of a scheme to defraud hundreds of innocent individuals — many of them elderly, in financial trouble, or lacking the means to defend against a clever telemarking scheme after their money had been taken — out of hundreds and thousands of dollars. An overwhelming amount of witnesses have testified thus far to this fact, and the Government has presented a mountain of documentary evidence to support such a finding. This is, of course, not to mention his thirteen alleged co-conspirators who have entered guilty pleas before this Court and implicated him in the execution of the alleged conspiracy. As such, there is certainly substantial evidence that Adam Lacerda used his intelligence and abilities to deceive members of this community, and that he continues to endanger them by reaching out to them in violation of the law and his own pretrial release conditions. Accordingly, the Court concludes that Adam Lacerda poses a danger to the community in the sense of a continued cover-up of far reaching and substantial financial crimes that victimized some of the most vulnerable members of our society.

Lastly, and perhaps most importantly under the present circumstances, § 3142(g) requires the Court to consider the Defendant's past conduct and record concerning appearances at prior court proceedings before ordering his detention. See 18 U.S.C. § 3142(g)(3)(A)("The judicial officer shall . . . take into account the available information concerning . . . the history and characteristics of the person, including . . . past conduct . . . and record

concerning appearance at court proceedings[.]"). Adam Lacerda's past

conduct during the course of this criminal matter is perhaps the

weightiest factor counseling in favor of detention under the present

circumstances. The evidence of record is clear that he, his wife, his

co-conspirators, his employees, and his in-house counsel have

consistently and repeatedly engaged in a pattern of conduct designed

to thwart the investigation and prosecution of this matter, and have

attempted to perpetuate a fraud on this Court charged with the

responsibility to uphold justice for all concerned:

> (1)  The record suggests that Adam Lacerda and his co-
> conspirators have consistently attempted to contact
> witnesses to prevent them from assisting in the
> investigation and prosecution of this matter in violation
> of 18 U.S.C. § 1512(b) and their existing bail orders;

> (2)  The record suggests that that VO Financial in-house
> counsel (an individual hired by and who works in concert
> with and at the direction of Adam Lacerda) complicated and
> prolonged these proceedings by interfering with jury
> selection in this matter,[23] assisted in the creation of and

---

[23]  VO Financial's in-house counsel (the same attorney who also
apparently penned the unethical letter to victim/witness Karen Wolff),
compelled this Court to separately voir dire a large segment of the
jury panel after he had inappropriate contact with them at the time
and expense of all the parties involved. Specifically, this lawyer —
whose presence in the courtroom was not made known to the Court
despite the defense knowing the Court's standard practice to have
individuals associated with a party introduce themselves — sat in and
amongst the jury panel assembled in the gallery of the courtroom.
There, he made derogatory comments about a presumptive juror already
in the jury box loudly enough for other jurors to hear, listed jurors'
juror numbers on a legal pad and put a large "X" through them plainly
enough for a prospective juror to see, and by his own admission wrote
out VO's defense strategy on the same legal pad. The attorney also
crossed into the well of the Court in view of the jury panel to pass

sanctioned a misleading script designed to deceive victims of Defendants' allegedly fraudulent scheme, and directly contacted victims in violation of the law and — at a minimum — the New Jersey Rules of Professional Conduct;

(3) The record suggests that Adam Lacerda caused his counsel to falsely argue that any contact of a victim or witness was an inadvertent result of VO Financial's robo-dialing system;[24]

(4) The record suggests that Adam Lacerda paid co-Defendant Resnick[25] over $200,000 in the year immediately before the trial to at least in part supervise the witness tampering scheme while at the same time knowing that Resnick had obtained free legal counsel under the CJA because of a claim he lacked funds to pay for one himself;

(5) And now, the record also suggests that Adam Lacerda was the intended recipient of a note from his close and trusted co-Defendant encouraging him to flee the country and cause a mistrial.

---

notes to the Lacerdas and for the purpose of offering his tie to one of the Defendants in pre-trial detention.

[24]  A defendant has the right to remain silent and a right to a presumption of innocence.  He also has the corollary right to put on a defense.  However, neither of these rights — taken together or independently — allow a defendant to obstruct the administration of justice or to present a defense that is itself knowingly false.

[25]  Ian Resnick, the author of the escape plan uncovered the other day, has a prior conviction for armed bank robbery.  A physically fit and imposing figure, he was, according to witnesses at trial, known for two things: (1) taking troublesome employees "out back" to the parking lot for discussions; and (2) his powers of persuasion. His nickname of "The Reaper" was apparently derived from his ability to close telephone deals that others could not. During the apparent recent execution of the witness tampering scheme, Adam Lacerda promoted Resnick to "Director of Compliance."

As such, when considering all of Adam Lacerda's prior conduct related to this criminal matter, the Court concludes that only detention will continue to insure his attendance at trial.[26]

In light of all the above considerations, these instances, individually and jointly, convince the Court that Adam Lacerda will not be able to "abide by any condition or combination of conditions of release" and that detention is now the required course of action to ensure the integrity of the judicial process.

Finally, the Court pauses to note the role that it has in presiding over this criminal proceeding while also assessing Adam Lacerda's compliance with the law and court orders. During the course of this matter, the Court has been placed in the difficult and awkward position of simultaneously wearing two hats. On the one hand, in presiding over the ongoing criminal trial, the Court must enforce the presumption of innocence, conduct a fair trial, and insure that the interests of all the parties and the public are protected.

On the other hand, however, the Court is simultaneously presented with evidence of a separate conspiracy of witness tampering upon which it must assess the evidence of Defendants' guilt in order to ensure that they will not flee and to minimize the risk of endangering the community. This conduct has no doubt complicated the resolution of this case, and has made the Court's role as the enforcer of justice over this matter increasingly more difficult.

---

[26] At the hearing on this issue, counsel proffered real estate to secure a bond. No posting of a bond will ensure that Adam Lacerda will cease his efforts to complicate, compromise, and confuse these proceedings.

However, the Supreme Court of the United States has indicated that "[f]ederal courts have an independent interest in ensuring criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them[.]" Wheat v. United States, 486 U.S. 153, 160 (1988). Therefore, in order to best facilitate the fair administration of justice and search for the truth during the ongoing criminal trial, the Court finds that detention of Adam Lacerda is necessary and appropriate under these circumstances. See Nix v. Whiteside, 475 U.S. 157, 166 (1986)("[T]he very nature of a trial [i]s a search for truth.").

## III. CONCLUSION

In light of the foregoing considerations and for the reasons orally expressed on the record on August 15, 2013, the Court orders Adam Lacerda detained for the remainder of this criminal trial pursuant to its authority under §§ 3142 and 3148 of the Bail Reform Act of 1984.

An appropriate Order follows.


*/s/ Noel L. Hillman*
_____
At Camden, New Jersey                    NOEL L. HILLMAN, U.S.D.J.


Dated: August 19, 2013